*Decision will be entered under Rule 50.*

ESTATE OF HERBERT B. MILLER, DECEASED, THE UNITED STATES NATIONAL BANK OF PORTLAND (OREGON), ADMINISTRATOR, D. B. N., C. T. A., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28582, 31063. Filed August 23, 1955.

---

*George W. Miller, Esq.*, and *David S. Pattullo, Esq.*, for the petitioner.

*John H. Welch, Esq.*, for the respondent.

926

OPINION.

RAUM, *Judge:* While two issues have been separately stated, they are actually different aspects of the same question. Both depend upon the reality of the purported indebtedness evidenced by the notes.

It should be noted at the outset that this is not a case involving "hybrid securities," a term generally used to describe corporate instruments bearing indicia both of evidence of indebtedness and of capital investment, where the problem is one of determining whether the terms of the instrument as read create an effect more like that of an investment or more like that of a debt. See, e. g., *Universal Oil Products Co.* v. *Campbell*, 181 F. 2d 451, 476–477 (C. A. 7), certiorari denied 340 U. S. 850; *Commissioner* v. *J. N. Bray Co.*, 126 F. 2d 612 (C. A. 5); *Commissioner* v. *Palmer, Stacy-Merrill, Inc.*, 111 F. 2d 809 (C. A. 9); *Commissioner* v. *Proctor Shop*, 82 F. 2d 792 (C. A. 9); *Mullin Building Corporation*, 9 T. C. 350, affirmed per curiam 167 F. 2d 1001 (C. A. 3); *Charles L. Huisking & Co.*, 4 T. C. 595.

The form of the notes in the instant case presents no such problem. These notes, standing by themselves, are clear evidences of indebtedness. As we understand respondent's position, it is that there was no genuine indebtedness underlying the notes, that the consideration purportedly given for the notes was in fact the true risk capital of the corporation and must be treated as reflected in the stock rather than the notes which must be disregarded. In short, it is another way of saying that substance must prevail over form, and the substance of the transaction at issue was that of a capital investment for stock and not a sale for notes. Our analysis of the facts forces us to agree with the conclusions of the respondent.

The form of a transaction has some evidentiary value, but it is not conclusive. *Gregory* v. *Helvering*, 293 U. S. 465. The same is true of bookkeeping entries. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179. The crucial factor here is not the formal characterization of these notes, but, rather, the proper characterization of the under-lying transaction and the relationship in fact created thereby. Cf.

*Gooding Amusement Co.*, 23 T. C. 408, on appeal (C. A. 6); *Kraft Foods Co.*, 21 T. C. 513, on appeal (C. A. 2); *1432 Broadway Corporation*, 4 T. C. 1158, affirmed per curiam 160 F. 2d 885 (C. A. 2). In *Kraft Foods Co., supra*, we said (21 T. C. at p. 594):

we do not have here a case in which the instruments involved had some of the characteristics of both debentures and certificates of stock * * *. In the instant case, all of the requirements of form and ritual necessary to make the instruments debentures were meticulously met. They were either evidences of indebtedness and effective as such, or, being purely ritualistic and without substance, were futile and ineffective to make the annual payments interest.

The intention of the parties is controlling, and such intention is a fact to be gleaned from the entire record. Cf. *Tribune Publishing Co.*, 17 T. C. 1228; *Ruspyn Corporation*, 18 T. C. 769; *Isidor Dobkin*, 15 T. C. 31, affirmed per curiam 192 F. 2d 392 (C. A. 2); *Lansing Community Hotel Corporation*, 14 T. C. 183, affirmed per curiam 187 F. 2d 487 (C. A. 6); *Sam Schnitzer*, 13 T. C. 43, affirmed per curiam 183 F. 2d 70 (C. A. 9), certiorari denied 340 U. S. 911; *Cleveland Adolph Mayer Realty Corporation*, 6 T. C. 730, reversed on another issue 160 F. 2d 1012 (C. A. 6); *Joseph B. Thomas*, 2 T. C. 193.

In *United States* v. *Title Guarantee & Trust Co.*, 133 F. 2d 990 (C. A. 6), where it was held that under the facts of that case the intention of the parties was to create a true debtor-creditor relationship, the court said at page 993:

*The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit.* The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * * [Italics in original.]

Applying the foregoing criteria to the facts before us, we must conclude that we have here no bona fide intention to effect a true debtor-creditor relationship. The partners at all times intended to be investors in the corporate business, as they had been in the firm business, to the full extent of all value contributed by them. The cash and other property transferred to the corporation was deemed by them and was in fact necessary for the successful operation of that business. Cf. *Hilbert H. Bair*, 16 T. C. 90, affirmed 199 F. 2d 589 (C. A. 2). The contributions which petitioner contends created an indebtedness constituted substantially everything the corporation owned[1] and which it required in order to commence doing busi-

---

[1] In form, the $50,000 cash appeared to come from the partners personally. However, the evidence discloses that the partnership had a substantial amount of cash and that such cash was taken out by the partners prior to the transfer of partnership assets to the corporation. It seems quite clear that the $50,000 cash represented in substance that portion of the partnership cash that the partners regarded as necessary to operate the business.

ness and to remain in business. It was at all times intended that the value of such contributions should remain indefinitely at the risk of the going business as part of its permanent capital structure. To be sure, the partners undoubtedly expected, as contended by petitioner, earnings to be sufficiently high that in a relatively short time they would be able to withdraw sums approximating in amount their original capital investment without impairing necessary capital; and subsequent events seem to prove this expectation to have been justified. This, however, does not alter the fact that everything transferred to the corporation in May and June of 1946 was intended to remain therein as part of its permanent capital structure; only surplus earnings, to be subsequently acquired as a result of successful operations of the business, were in fact intended to be withdrawn. Cf. *Gregg Co. of Delaware*, 23 T. C. 170, on appeal (C. A. 2). Indeed, petitioner's contention proves too much. It demonstrates plainly to us that the partners intended to use the notes as a device to siphon subsequent earnings from the enterprise while leaving the basic business assets with the corporation. Purported payments upon the notes in such circumstances would be in substance nothing more than the distribution of dividends to the stockholders, who held the notes in the same proportion as their stockholdings.

Although the notes in form are absolute, and call for fixed payments, we have no doubt, from a reading of the entire record, that no payment was ever intended or would ever be made or demanded which would in any way weaken or undermine the business. As we said in *Gooding Amusement Co.*, *supra*, 23 T. C. at page 418:

There is nothing reprehensible in casting one's transactions in such a fashion as to produce the least tax * * *. On the other hand, tax avoidance will not be permitted if the transaction or relationship on which such avoidance depends is a "sham" or lacks genuineness. The concept that substance shall prevail over form has likewise been enunciated in numerous cases. * * *

In the instant case, in the matter of form, the notes in question present no problem of interpretation. The formal criteria of indebtedness are unquestionably satisfied. The notes on their face are unconditional promises to pay at a fixed maturity date a sum certain and the payment of interest thereon is not left to anyone's discretion. The instruments in form are pure evidences of indebtedness.

But we are not limited in our inquiry to the instruments themselves. We may look at all the surrounding circumstances to determine whether the real intention of the parties is consistent with the purport of the instruments. * * *

The most significant aspect of the instant case, in our view, is the complete identity of interest between and among the three note holders, coupled with their control of the corporation * * *. It is * * * unreasonable to ascribe to the husband petitioner * * * an intention at the time of the issuance of the notes ever to enforce payment of his notes, especially if to do so would either

impair the credit rating of the corporation, cause it to borrow from other sources the funds necessary to meet the payments, or bring about its dissolution * * *

In *Mullin Building Corporation, supra*, we said (9 T. C. at p. 355) :

> If the debenture stockholders are entitled to enforce payment * * * upon default * * * and should do so, petitioner's only income-producing asset * * * would either have to be liquidated or encumbered * * *. If the [asset] should be liquidated, the flow of * * * income therefrom would cease; or, if the [asset] should be mortgaged * * * petitioner would pay out a large part of its earnings in interest and for retirement of principal to its mortgage creditor * * *. Such a course would be too irrational * * * to merit * * * contemplation * * *. Such a course is not within the realm of sane business practice and we are convinced that it was not intended.

Similarly, in the case at bar, in the light of all the surrounding facts and circumstances, it is not reasonable to accept the absoluteness in form of the notes at face value. To do so would be to impute a willingness on the part of the partners to endanger their chief source of livelihood.

And see *1432 Broadway Corporation, supra*, where we said (4 T. C. at p. 1164) :

> The debentures are in approved legal form, and, if their legal attributes alone were determinative of the character of the interest accruals, there would be little room for doubt that they were the indebtedness they purport to be. [Citing.] But, for tax purposes, their conformity to legal forms is not conclusive. Although a taxpayer has the right to cast his transactions in such form as he chooses, * * * the Government is not required to acquiesce in the taxpayer's election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. * * * The Government is not bound to recognize as the substance or character of a transaction a technically elegant arrangement which a lawyer's ingenuity has devised. * * *

The record before us satisfies us that the partners were in fact investing, and not selling their business for notes. Formal capital was nominal in amount, and grossly inadequate in view of the normal needs of the business operations anticipated. The partners had been in the same business for many years, and we are satisfied that they were well aware of this inadequacy.

We do not have to decide here whether inadequate capitalization standing alone justifies the treatment of amounts alleged to represent indebtedness as invested capital. Cf. *Erard A. Matthiessen*, 16 T. C. 781, affirmed 194 F. 2d 659 (C. A. 2). At any rate, it at least invites close scrutiny. *Alfred R. Bachrach*, 18 T. C. 479, affirmed per curiam 205 F. 2d 151 (C. A. 2). Here the purported indebtedness arose as a result of pro rata advances by all the shareholders; it was created at the time of incorporation when the need for substantial additional permanently invested capital was apparent to the stockholders; all of the stock of the corporation was closely held

by three brothers who had also been partners in the business which was being incorporated; and we can find no business purpose other than hoped-for avoidance of taxes necessitating a predominant debt structure and capital stock of a nominal declared value. *Isidor Dobkin, supra; Swoby Corporation*, 9 T. C. 887; *Edward G. Janeway*, 2 T. C. 197, affirmed 147 F. 2d 602 (C. A. 2). Cf. *Ruspyn Corporation, supra; Clyde Bacon, Inc.*, 4 T. C. 1107.

In the *Dobkin* case, *supra*, we said (15 T. C. at p. 32) :

> Ordinarily contributions by stockholders to their corporations are regarded as capital contributions that increase the cost basis of their stock, * * * Especially is this true when the capital stock of the corporation is issued for a minimum or nominal amount and the contributions which the stockholders designate as loans are in direct proportion to their shareholdings. *Edward G. Janeway, supra.*

> When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business * * *

The State of Oregon requires that corporations with no-par stock have at least $1,000 formally designated as invested capital. Ore. Comp. Laws, sec. 77–228. Petitioner admits on brief that one of the purposes of the partners was to "limit the capital of the company to a bare minimum allowed by the corporation laws of the State of Oregon." While we would have so concluded independently, the above admission makes it even more apparent that the amount of $1,050 formally designated as invested capital was totally unrelated to any estimate of the actual need for capital investment, and was selected as the lowest round figure conveniently divisible into three equal parts which would satisfy State law. That amount bore no relation to the amount the partners knew would have to be permanently tied up in the business, and is not a bona fide measure of their capital investment. As we said in *Sam Schnitzer, supra*, 13 T. C. at page 62:

> The testimony of petitioner's witnesses, * * * that the shareholders never intended to invest more than $187,800 in stock is intelligible only as showing an agreement about mere form.

Petitioner has attempted to convince the Court that the denominated capitalization was not in fact inadequate by emphasizing the prior history of high earnings and the promising future that faced the business in 1946. The answer to this argument is also found in *Sam Schnitzer, supra*, where we said at page 61:

> Petitioners argue that large operation profits were reasonably anticipated * * *. In support they stress the mill's substantial earnings in recent years and the unexpected difficulties which they encountered in erecting it. This argument lacks persuasive force. Even if the corporation had paid off

the balance in its open account with [the partnership] from earnings, such payment would still have partaken of the character of dividend distributions on risked capital invested in the plant. A corporation's financial structure in which a wholly inadequate part of the investment is attributed to stock while the bulk is represented by bonds or other evidence of indebtedness to stock holders is lacking in the substance necessary for recognition for tax purposes, and must be interpreted in accordance with realities * * *

We do not deem it a distinguishing feature that in the *Schnitzer* case the expectation of high earnings was initially disappointed whereas in the case at bar it was fully satisfied. The language of that case indicates that such fact would have made no difference, and we agree that it should not.

Petitioner has cited *John Kelley Co.* v. *Commissioner*, 326 U. S. 521. That case, however, is of no aid to petitioner, for the very important factor of inadequate capitalization was found to be absent there. The Court did allude to just the situation we have here, however, in language which can be of no comfort to petitioner, saying at page 526:

As material amounts of capital were invested in stock, we need not consider the effect of extreme situations such as nominal stock investments and an obviously excessive debt structure.

See also *Ruspyn Corporation, supra*, 18 T. C. at p. 777; *Swoby Corporation, supra*, 9 T. C. at p. 893; *Erard A. Matthiessen, supra*, 16 T. C. at p. 785; *Edward G. Janeway, supra*, 2 T. C. at p. 202; *R. E. Nelson*, 19 T. C. 575, 579; *Sheldon Tauber*, 24 T. C. 179, is distinguishable, in that the Court there was of the opinion that the facts showed no undercapitalization.

The record in the instant proceeding satisfies us that there was no valid business purpose which dictated the gross undercapitalization here present. There seems to be no question that sound reasons existed for forming a corporation to carry on the business, which had been operating up to that time as a copartnership, but every advantage sought through incorporation, except that of the avoidance of taxes, could have been accomplished with equal facility and assurance of success by the more normal method of the issuance of capital stock of a par or declared value more nearly commensurate with the total amount permanently contributed to the corporation, and with which it was expected thereafter to conduct its affairs. In *Mullin Building Corporation, supra*, the point was disposed of by saying (9 T. C. at p. 358):

Petitioner claims that the purpose * * * was to satisfy James Mullin's desire to establish a steady income for his family and improve the sales company's credit position. The creation of petitioner accomplished these purposes just as fully by treating the debenture stock as an investment creating a proprietary interest as by treating it as an evidence of debt. * * * It was not necessary to create a 29 to 1 debt to capital ratio * * * to accomplish these ends. * * *

It may be quite true that the discovery of cancer in the decedent motivated the formation of the corporation so as to provide for continuity of the business in the event of death of one of the three brothers or in other circumstances. There was thus adequate business reason for incorporating the enterprise. But there was no business reason apparent on this record that called for such an absurdly low capitalization as petitioner asks us to accept at face. The argument that there was a business reason for incorporating the enterprise is merely a smoke screen that may be calculated to hide the absence of any business reason for attempting to achieve the result in the form that was employed.

It has not escaped our attention that the notes in question are secured, and were not expressly subordinated to obligations of other creditors. Viewing, however, as we must, all the surrounding facts, this circumstance is not impressive. This, in our opinion, is again a matter of perfection of form, wherein what was in fact capital investment has been garbed in the raiment of indebtedness. In addition, we have serious doubts as to the extent to which such security would be upheld as against the claims of outside creditors, should the attempt to do so ever have to be made, as in bankruptcy. In *Arnold v. Phillips*, 117 F. 2d 497 (C. A. 5), certiorari denied 313 U. S. 583, a deed of trust was made in favor of the dominant stockholder as security for advances already made and to be made in the future. The stockholder later foreclosed on his security. Subsequently, the deed of trust and foreclosure were set aside by the bankruptcy court, even in the absence of fraud, on the ground that there was an inadequacy of original capital, of which the stockholder was aware. The advances were treated as stock subscriptions, and payments thereon, designed as interest, were held to constitute dividends.

Since we have concluded that there was no indebtedness, it must follow that all payments purportedly made on the notes, including those denominated as payments of principal, must in fact constitute taxable dividends within section 115(a) of the Internal Revenue Code of 1939 to the extent of available earnings and profits. As we said in *Gooding Amusement Co., supra*, 23 T. C. at page 421:

Since the notes did not, in reality, represent creditor interests, the payments made to the stockholders * * * must be considered not as payments of a bona fide indebtedness of the corporation, but as distributions of corporate profits to the stockholders as stockholders and not as creditors. Therefore, we conclude that they constituted dividends under the broad language of Section 115(a) * * * The fact that the corporation, or rather the petitioner, may have had no intention of distributing earnings under the guise of discharging debts is immaterial.

For the foregoing reasons and on the strength of the above authorities, we decide the first issue in favor of the respondent.

The second issue is the applicability of section 112 (b) (5) of the Internal Revenue Code of 1939. This issue must be resolved in favor of the respondent for reasons that have already been set forth as determinative of the first issue. We have previously concluded that there was no true debt, and that all the assets transferred to the corporation in May and June of 1946 represented invested capital. The true consideration for this transfer consisted of the shares of capital stock of the corporation, all of which were issued to the transferors in proportion to their respective interests in the property transferred by them. The notes are a mere sham, and have no reality. The transaction, thus viewed, falls squarely within the provisions of section 112 (b) (5). "Since we have found * * * the notes * * * in fact representative of. risk capital invested in the nature of stock, the 'solely in exchange for stocks or securities' requirement of section 112 (b) (5) was, in our considered judgment, satisfied." *Gooding Amusement Co., supra,* at p. 423.

"Property" includes money, so the fact that cash as well as business assets were contributed cannot affect this result. *Halliburton* v. *Commissioner*, 78 F. 2d 265 (C. A. 9); *George M. Holstein, III*, 23 T. C. 923.

Section 112(b)(5) is applicable, and the basis of the assets transferred to the corporation is, pursuant to section 113 (a) (8) of the Internal Revenue Code of 1939, the same as that in the hands of the transferors, no gain having been properly recognized with respect thereto on the transfer. Accordingly, the amount of earnings and profits available for distribution as a dividend, and the amount of the deficiency are as asserted by the respondent in his notice.

*Decisions will be entered for the respondent.*